**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

DONNA MARIA BONGARZONE,

         **Plaintiff,**

    -against-

COMMISSIONER OF SOCIAL SECURITY,

         **Defendant.**
-----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___ 4/29/2015

**14-CV-01054 (SN)**

**OPINION & ORDER**

**SARAH NETBURN, United States Magistrate Judge:**

 Plaintiff Donna Maria Bongarzone brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of the final determination of the Commissioner of Social Security (the "Commissioner"), which held that Bongarzone was overpaid by $19,239.00 in disability benefits ("DIBs") for the period September 2002 through December 2003, and June 2006 through January 2008, when she engaged in substantial gainful activity ("SGA"). Bongarzone moved, and the Commissioner cross-moved, for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

 Because the determination of the administrative law judge ("ALJ") is free of legal error and supported by substantial evidence, Bongarzone's motion for judgment on the pleadings is DENIED, and the Commissioner's motion is GRANTED.

## BACKGROUND

 Only Bongarzone's income – not her disability – is at issue in this appeal. Therefore, although the administrative record contains medical evidence and earnings outside the periods in question, only facts about her income for the disputed times are relevant and will be considered.

 The following facts are taken from the administrative record.

## I.    Social Security Numbers and Income

Bongarzone was born on January 5, 1957. Her birth certificate lists her name as "Dominica Donna Bongarzone." (AR 148.) She received a Social Security Number ("SSN") that began with 104 (the "104-SSN") on September 26, 1963, under the name "Donna Maria Bongarzone." (<u>Id.</u>) She used the 104-SSN to apply for DIBs, and it has no reported income associated with it. On September 20, 1985, Bongarzone submitted a separate SSN application for "Dominica Bongarzone," which affirmed "that this person had not received a Social Security Card before." (AR 282.) Accordingly, the Social Security Administration ("SSA") issued a second SSN to Bongarzone, which began with 072 (the "072-SSN"). A Federal Insurance Contributions Act ("FICA") report indicates that Bongarzone received earnings on the 072-SSN in 1999, 2002, 2003, 2005, and 2006. Bongarzone does not now, and has never, denied that she received the following amounts.

In 1999, Washington Mutual paid Bongarzone $10,173.88. In 2002 and 2003, Countrywide Home Loans ("Countrywide") paid her a total of $26,221.44 in 2002, and $43,859.75 in 2003. Monthly statements from Countrywide show that Countrywide paid Bongarzone regular payments. The statements list Bongarzone's SSN as the 072-SSN and list her "Rate/Salary" as ".00." Each statement indicates the "federal taxable wages for this check," "your year-to-date gross pay," as well as the portion of federal income, social security, Medicare, NY State Income, and NY Stat DI/SUI taxes that were withheld. In 2005, Bongarzone earned $1,295.00 from self-employment. In 2006, First Lincoln Mortgage Corporation ("First Lincoln") paid her $4,961.25.

On May 21, 2007, Bongarzone's attorney Spencer Steele wrote to Countrywide, and copied the SSA, seeking clarification – either confirming or denying Bongarzone's account that

she had done no work to receive the earnings. In the letter, Steele indicated that Bongarzone started working as a loan officer at age 23 or 24, but stopped after a stroke and the onset of her disability. Steele stated that, during the time period for which she received earnings, Bongarzone went to the Countrywide office "once or twice a week. She might have handled two deals on the phone on the days that she worked. Jeffrey Margolis was the Manager." (AR 284.) Steele continued that Bongarzone claims that she "was treated as a hire, although she did no work." (AR 306.)

## II.     Administrative Hearings and Decisions

### A.     First ALJ Hearing

On July 24, 2008, Bongarzone appeared, with her attorney Spencer Steele, before ALJ Hazel C. Strauss. Steele explained that Bongarzone does not dispute the dollar amounts that she received from Countrywide but disputes the purpose for which they were paid. He reasoned that Bongarzone had been physically unable to "perform the work that goes under that [Dictionary of Occupational Titles] title of [] loan officer." (AR 392-94.) As a result, in order to determine whether Bongarzone received employment wages, pursuant to 20 C.F.R. § 404.1041, Steele requested that the ALJ subpoena Countrywide. The ALJ responded that a subpoena was not necessary: Steele should get his client's authorization and just contact the bank. Steele disagreed, stating that he had already done as much, but Countrywide had still refused to provide him any documentation. Steele also argued that any erroneous payment to Bongarzone should be waived because she was without fault in accepting the overpayment. The ALJ ruled, however, that there was no Request for Waiver of Overpayment Recovery in the file, and such a request must be made first to the local SSA office.

Bongarzone testified that she did not have a job with Countrywide, but "a draw." (AR 358.) Her "job title was loan officer," and a loan officer's function is to give mortgages. (AR 367.) She recounted that her friend Linda Droe was working with Countrywide when its manager, Jeffrey Margolies, began looking for individuals to serve as draws. Bongarzone testified that Margolies "put me on a payroll as a draw, and I do not have to work. I do not have to go in there. I don't have to do anything." (AR 368.) "Normally, a draw is given as an incentive, and once they [] make a deal, the draw is taken back." (AR 369.) Here, the bank gave her the draw, which was charged against a commission: "whatever [Margolies] makes, he keeps the money, and he gives me the draw." (AR 372.) And "for that, if he shows his superior that he has people working for him, [h]e gets a raise. He gets a bonus." (AR 372-73.) Bongarzone testified that she never recommended any client to get a loan at Countrywide, Washington Mutual, or First Lincoln.

With regards to First Lincoln, Bongarzone testified, "No, I didn't work for them. That was a recommendation to someone, and then all of a sudden I got checks from First Lincoln all on the same day for the same amount." (AR 362.) She repeated numerous times that she was "confused" but ultimately explained that there had been a man who needed a home or equity loan, and she referred him to another man named Anthony, an independent broker who dealt with banks. In return, Anthony offered her a referral or finder's fee. (AR 363-64, 376-77.)

The ALJ next asked Bongarzone about her two SSNs. Bongarzone explained that she received the 104-SSN when she was 18 or 19 years old. She has no earnings on that SSN but receives DIBs on it. Bongarzone testified that she lost her SSN card for that number and went to the Social Security Office to get a new one: "I brought my birth certificate, and I said look, this is the number that I used Donna. I don't use Domeni[c]a, okay? On my birth certificate, it says

4

Domenica Donna." (AR 382.) Bongarzone testified that the SSA officer said she understood: that the new card would say Donna Bongarzone and it would be the same 104-SSN. When the card arrived, however, it had the 072 number. She called the SSA to explain and was told "we do not take numbers back. . . . You can do anything you want to do under either number, as long as you pay your taxes." (AR 382-83.)

Next, the ALJ asked Bongarzone about her $1,295.00 self-employment earnings from 2005. Bongarzone testified that she did not have a copy of her tax return for that year and she did not work in 2005. After an extended colloquy, Bongarzone stated, "I don't know [what my self-employment in 2005 was]. I have to go home and dig through the stuff and find it out. This is the first time I know of this, so I can't answer it." (AR 390.)

Steele agreed to try to provide the ALJ with W-2s from all of the wage providers, and the hearing was adjourned.

### B.      Bongarzone's Actions After the Hearing

After the hearing, on August 5, 2008, Steele wrote a letter to ALJ Strauss, requesting that she subpoena Jeffrey A. Margolies, the individual that Bongarzone alleged hired her at Countrywide. The address Steele provided for Margolies appears to be a residence. Steele's efforts without a subpoena, of which he provided proof, had been unsuccessful, and he opined that Margolies would be able to confirm or deny Bongarzone's claim that she had not actually worked for Countrywide.

On August 29, 2008, Bongarzone submitted a Request for Waiver of Overpayment Recovery or Change in Repayment Rate (SSA-632). In it, she checked the box that states, "The overpayment was not my fault and I cannot afford to pay the money bank and/or it is unfair for other reasons." (AR 157.) She also averred, "I did nothing wrong. [A]ll Banks draws are given

whether a person works or not. This is a practice in banks for many years. . . . I did not

work. . . ." (AR 157-58.) She stated that the overpaid benefits were used for rent, bills, and food.

On October 30, 2008, Steele renewed his subpoena request, which had not been addressed.

(AR 213-14.)

      **C.**     **First ALJ Decision**

      In her November 14, 2008 decision, the ALJ first characterized Bongarzone's testimony

that "she had been doing some type of unspecific referral work on commission for bank and

mortgage companies." (AR 185.) The ALJ explained that although she had said at the July 28,

2008 hearing that she would attempt to contact financial institutions from which Bongarzone

received earnings, she declined to do so upon further consideration because Bongarzone "admits

that she received the sums charged to her Social Security account and because the facts elicited

in this case as stated below." (Id.)

      The ALJ considered Bongarzone's explanation for having two SSNs, and noted that

Bongarzone calls herself "Donna," that her birth certificate states "Dominica," and her middle

name is either Donna or Maria. (Id.) The ALJ found that Bongarzone's original SSN was the

104-SSN, and no earnings were attributed to it from 1965 through 1991. She used that SSN to

apply for DIBs in 1994, and she was found disabled as of January 20, 1992. The 072-SSN,

issued on September 25, 1985, had earnings attributed to it in 1999, 2002, 2003, 2005, and 2006.

Because the SGA "levels for 2002 and 2003 were $780.00 and $800.00 per month respectively,"

the ALJ found that Bongarzone's earning from September 2002 through December 2003 were at

the SGA level. (AR 185 n.1.) The ALJ concluded that Bongarzone had been overpaid

$12,560.00.

The ALJ noted that although the New York State Office of the Inspector General's fraud case against Bongarzone had been closed, the two SSNs still "could be construed as an effort to hide her earnings under her Social Security Number on which she was not being awarded benefits. She knew, or should have known, the number on which she was receiving benefits was different from the one she gave the employers who credited her account with earnings." (AR 185-86, 318.) The ALJ found that Bongarzone's explanation regarding the two SSNs, with two different versions of her name, was not credible.

With regards to receiving earnings for which Bongarzone did no work, the ALJ also found that Bongarzone's "story is so far fetched as to how she received the earnings credited to her that it lacks credibility. . . . It stretches credulity to believe that she was paid sums admittedly received for doing nothing." (AR 186.) The ALJ concluded that Bongarzone's earnings constituted SGA. Regardless of whether Bongarzone believed the earnings were a "draw," she should have informed the SSA of the sums she was receiving, which would have allowed the SSA to "investigate and advise her so that [she] could have avoided the overpayment." (Id.) Because Bongarzone's "actions in total appear to be deceptive[, Bongarzone] was not without fault in receiving the overpayment." (Id.)

Finally, the ALJ wrote that, "[t]he issue of waiver is referred to the Social Security office for its determination." (Id.)

### D.    Appeals Council Decision

On January 5, 2010, the Appeals Council granted Bongarzone's request for review, vacated the ALJ's decision, and remanded the case for further proceedings. First, while the ALJ "found that [Bongarzone] had been overpaid, the decision did not indicate the period of overpayment considered." (AR 259.) The ALJ's decision referenced overpayment for September

2002 through December 2003, but the record demonstrates that Bongarzone performed SGA from September 2002 through December 2003, and from June 2006 to January 2008, both periods for which she was overpaid. Second, because Bongarzone's DIBs were reinstated in February 2007, the second time period's overpayment might require adjustment. Third, the Appeals Council noted that although the ALJ's decision was unclear, the issue of waiver was not properly before the ALJ "as it has not been requested by the claimant prior to the hearing." (AR 260.) Lastly, the Appeals Council directed the ALJ to address Bongarzone's arguments that the subpoena request was improperly denied under the procedures described in HALLEX I-2-5-78.

### E.  Supplemental ALJ Hearing

On May 19, 2010, before holding a supplemental hearing, ALJ Strauss denied Steele's request for a subpoena in writing, stating: because Steele had merely used "Choicepoint's AutotrackXP data bases . . . there is no confirmation that this is the same individual with whom claimant alleges she dealt." (AR 282.)

On May 11, 2011, Bongarzone appeared, now represented by attorney Max Leifer, before ALJ Strauss for a supplemental hearing. The ALJ first reviewed the basis for the Appeals Council's remand. The ALJ explained that she had asked the Social Security Office to provide her with the basis for the overpayment, which they did in an Office of Disability Adjudication and Review ("ODAR") case summary, and had added it to the record.

Leifer explained to the ALJ that although Bongarzone received funds, "she did not commit SGA": "What I would proffer to you is that . . . Countrywide Home Loans was taken over by Bank of America, and was found to be a fraudulent company that issues these prime loans, and did a lot of hanky-panky that caused Countrywide to go out of business." (AR 401.)

First Lincoln also went out of business because of its "fraudulent conduct." (Id.) He continued that although the Office of the Inspector General had investigated Bongarzone's earnings, there was no determination of fraud on Bongarzone's part. He argued that, because she did not engage in SGA, the burden is on the Commissioner to demonstrate that she did.

Bongarzone then testified about the nature of her hiring and earnings: "The only thing . . . I did was [let] them use my name, and I received the draw[] for it. I did no work. I didn't go in." (AR 405.) A manager said to her, "I will give you a draw[] for certain amount of time, but the commissions belong to me, and I will give you a draw[] . . . . I only want to use your name, and I'll be helping you, and you're helping me . . . ." (AR 406.)

Leifer agreed to send the ALJ opinions that he thought were dispositive of this case's outcome, and the ALJ adjourned the hearing.

### F.      Final ALJ Decision

In her second opinion, dated December 15, 2011, the ALJ concluded that Bongarzone was overpaid within the meaning of the Act, and that she was liable for the overpayment. See 20 C.F.R. § 404.501(a); 42 U.S.C. § 404(a)(1)(A). She also confirmed, as held by the Appeals Council, that because Bongarzone did not raise the issue of waiver until after the initial hearing, the issue was not ripe for a decision.

First, the ALJ determined that Bongarzone's request for a subpoena of Jeffrey A. Margolies was properly denied under the procedures set forth in HALLEX I-2-5-78, 1992 WL 601841 (Sept. 28, 2005). Where "the ALJ determines that the evidence or information is not reasonably necessary for the full presentation of the case, the ALJ may deny the subpoena request." HALLEX I-2-5-78(C). The ALJ found that "no evidence was submitted to confirm that the individual identified [in the subpoena] was the same individual with whom the claimant

alleged she dealt." (AR 17.) The ALJ explained that she also had provided Bongarzone with written notification and rationale, pursuant to HALLEX I-2-5-78(D).

Second, the ALJ determined that Bongarzone had been overpaid $12,560.00 from September 1, 2002 through December 1, 2003, and $6,679.00 from June 1, 2006 through January 1, 2008, resulting in an overpayment of $19,239.00. The ALJ noted that "[t]he claimant has alleged a peculiar set of facts and circumstances." (AR 17.) Although Bongarzone's claims to have done no work to get her "draw," she "[n]evertheless . . . acknowledges she was paid for whatever were her efforts." (AR 18.) The ALJ concluded that her earnings, as a result, constituted SGA. Because SGA "levels for 2002 and 2003 were $780.00 and $800.00 per month respectively," Bongarzone's earnings from September 2002 through December 2003, on the 072-SSN were at the SGA level. (Id.) The ALJ then described "another peculiar claim in this case," namely Bongarzone's two SSNs. (Id.)

In complete reliance on the ODAR analysis, the ALJ determined that Bongarzone's overpayment from September 2002 through December 2003, totaled $12,574.00, calculated as follows: $743.00 monthly September through November 2002, $753.00 for December 2002, $798.00 monthly for January through November 2003, and $814.00 for December 2003. Due to a retroactive increase in 2007 benefits, the SSA subsequently withheld $14.00 towards recovery of overpayment, and adjusted her overpayment to $12,560.00.

The ALJ determined that Bongarzone's earnings for June 2006 through January 2008 also exceeded SGA levels, and her overpayment for that time period totaled $19,566.00, calculated as follows: $953.00 monthly for June through November 2006, $984.00 for December 2006, and $986.00 for January 2007. Because Bongarzone's DIBs were retroactively reinstated as of February 2007, however, she was due $986.00 per month from February 2007 through

November 2007 (or $9,860.00), and $1,009.00 per month from December 2007 through January 2008 (or $2,018.00). Deducting these DIBs amounts from $19,566.00, Bongarzone's overpayment for June 2006 through January 2007 totaled $7,688.00. In addition, because Bongarzone received only provisional payments during her reinstatement proceedings beginning in March 2008, she was also due a monthly benefit for February 2008 of $1,009.00. Accordingly, the ALJ adjusted her overpayment to $6,679.00. Adding $12,560.00 and $6,679.00, the ALJ concluded that Bongarzone had been overpaid $19,239.00.

The remaining portion of the ALJ's opinion was largely identical to her first opinion: she explained why she saw no need to contact the employer financial institutions; she noted that Bongarzone's two SSNs "could be construed as an effort to hide the earnings," and Bongarzone "knew, or should have known," to disclose the information to the SSA; and she noted that Bongarzone's story is "far-fetched," "lacks credibility," and "stretches credulity." (AR 21.) The ALJ also added that "[t]he sums [Bongarzone] received as a 'draw' were not inconsequential and it appears that she attempted to hide this income by using [two SSNs]." (Id.) The money that Bongarzone received constituted SGA, Bongarzone's actions were deceptive, and Bongarzone was not without fault in receiving the overpayments.

### G.    This Appeal

On September 11, 2013, the Appeals Council denied Bongarzone's request for review, rendering the Commissioner's decision final. On June 23, 2014, Leifer wrote to the Appeals Council requesting an extension of time to file an appeal in federal court. On August 12, 2014, the Appeal Council extended the time within which Bongarzone could commence a civil action to December 18, 2013, the date this action was filed.

**DISCUSSION**

I.    **Standard of Review**

A party may move for judgment on the pleadings "[a]fter the pleadings are closed – but early enough not to delay trial." Fed. R. Civ. P. 12(c). A Rule 12(c) motion should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. (UPGWA) & Its Local 537, 47 F.3d 14, 16 (2d Cir. 1995) (*per curiam*). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The determination of the ALJ may be set aside only if it is based upon legal error or is not supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). This review "involves two levels of inquiry. We must first decide whether [the agency] applied the correct legal principles in making the determination. We must then decide whether the determination is supported by 'substantial evidence.'" Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987) (citation omitted).

Thus, the Court first reviews the ALJ's decision for legal errors. If the ALJ committed legal error, the Court cannot affirm the ALJ's decision. "'Where an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ.' Failure to apply the correct legal standards is grounds for reversal." Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984) (citations omitted).

If the error is not legal but factual, the Court looks to whether the ALJ's decision is supported by substantial evidence. "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995). See also Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). This means that if there is sufficient evidence to support the final decision, the Court must grant judgment in favor of the Commissioner, even if there also is substantial evidence for the plaintiff's position. See Brault v. Soc. Sec'y Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) ("The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." (citation and quotations omitted; emphasis in original)).

Though generally entitled to deference, "in order to accommodate 'limited and meaningful' review by a district court, the ALJ must clearly state the legal rules he applies and the weight he accords the evidence considered." Rivera v. Astrue, 10 Civ. 4324 (RJD), 2012 WL 3614323, at *8 (E.D.N.Y. August 21, 2012) (citing Reyzina v. Apfel, 98 Civ. 1288 (JG), 1999 WL 65995, at *13 (E.D.N.Y. February 10, 1999)). Without doing so, the ALJ deprives the Court of the ability to determine accurately whether his opinion is supported by substantial evidence and free of legal error. Where the ALJ fails to provide an adequate roadmap for his reasoning, remand is appropriate. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("[W]e do believe

that the crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.").

## II.     SSA Rules on Eligibility

Because social security income ("SSI") is a needs-based benefit, it is available only to "aged, blind, or disabled" individuals who meet strict income and resource limits. 42 U.S.C. § 1381a; 20 C.F.R. § 416.202. Under the Act, the term "disability" is defined, in part, as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). The regulations define "substantial gainful activity," or SGA, as "work activity that involves doing significant physical or mental activities . . . for pay or profit," 20 C.F.R. § 404.1572, "regardless of the legality of the work." SSA Program Operations Manual Systems ("POMS") DI 10501.001; 42 U.S.C. § 423(d)(4)(B). "[W]ork may be substantial even if it is performed on a part-time basis, or even if the individual does less, is paid less, or has less responsibility than in previous work." POMS DI 10501.001. "Work activity is gainful if it is the kind of work usually done for pay, whether in cash or in kind, or for profit, whether or not a profit is realized." Id. The SSA evaluates a claimant's "work to decide whether it is substantial and gainful regardless of whether [a claimant] spend[s] more time or less time at the job than workers who are not impaired and who are doing similar work as a regular means of their livelihood." 20 C.F.R. § 404.1573(e).

"In determining . . . when services performed or earnings derived from services demonstrate an individual's ability to engage in" SGA, the SSA looks to the claimant's earnings. 42 U.S.C. § 423(d)(4)(B); 20 C.F.R. § 404.1574. See also POMS DI 10501.015. When a claimant has received DIBs "for at least 24 months" and the SSA is considering whether she has "engaged in [SGA] or demonstrated the ability to engage in [SGA] for the purpose of

determining whether [her] disability has ceased," as is the case here, the SSA "will generally not

consider other information in addition to [a claimant's] earnings" to make the SGA

determination. 20 C.F.R. § 404.1574(b)(3)(iii). Rather, where monthly earnings average more

than the amounts in the regulation's earning table, there is a rebuttable presumption that a

claimant has engaged in SGA. 20 C.F.R. § 404.1574(b)(2)(i)-(ii); POMS DI 10501.015. See also

Fuentes v. Colvin, 13 Civ. 6201 (MWP), 2015 WL 631969, at *10 (W.D.N.Y. Feb. 13, 2015).

POMS, the SSA's internal agency manual, provides an updated table of SGA monthly earnings,

the following years of which are pertinent here:[1]

| For Month(s): | Nonblind Individuals Only: "Countable earnings" of employees indicate SGA and "countable income" of the self-employed is "substantial" if the amount averages more per month than: |
| --- | --- |
| In calendar year 2008 | $940 |
| In calendar year 2007 | $900 |
| In calendar year 2006 | $860 |
| In calendar year 2005 | $830 |
| In calendar year 2004 | $810 |
| In calendar year 2003 | $800 |
| In calendar year 2002 | $780 |

POMS DI 10501.015.

In looking at wages, "it is not important what they are called. Salaries, fees, bonuses *and*

*commissions* on sales or on insurance premiums are wages if they are remuneration paid for

employment." 20 C.F.R. § 404.1041(b) (emphasis supplied); POMS SI 820.100(B)(2)(c). "The

way in which [a claimant] is paid [also] is unimportant. Wages may be paid on the basis of

piecework or a percentage of the profits . . . [and] on an hourly, daily, weekly, monthly, or yearly

basis." 20 C.F.R. § 404.1041(c).

---

[1] POMS guidelines "have no legal force, and they do not bind the Commissioner." Tejada v. Apfel, 167 F.3d 770, 775 (2d Cir. 1999) (quoting Schweiker v. Hansen, 450 U.S. 785, 789 (1981)). Where they are inconsistent with the Act, courts do not apply them. Tejada, 167 F.3d at 775.

Even if an individual is incapable of performing SGA, her DIBs eligibility is limited by income she receives by other means. 20 C.F.R. § 416.1100. "[T]he more income [the claimant has] the less [her] benefit will be," 20 C.F.R. § 416.1100, as DIBs are calculated at "a flat monthly benefit rate . . . reduced by the amount of non-excludable income received by the individual." Gordon v. Shalala, 55 F.3d 101, 102 (2d Cir. 1995) (citing 42 U.S.C. § 1382(b); 20 C.F.R. §§ 416.1100, 416.1104); 20 C.F.R. §§ 416.410, 416.1112.

SSA regulations define "income" as "anything you receive in cash or in kind that you can use to meet your needs for food and shelter." 20 C.F.R. § 416.1102; Wagman v. Chater, 94 Civ. 7243 (DC), 1996 WL 219646, at *2 (S.D.N.Y. May 1, 1996) ("For the purposes of determining SSI benefits, income is defined as any actual economic benefit that the SSI recipient receives that can be used for food, clothing, or shelter, thereby reducing the need for SSI funds." (citations omitted)). "Income" includes both earned and unearned income. 42 U.S.C. § 1382a. Earned income includes, in part, wages and net earnings. 42 U.S.C. § 1382a(a)(1). The SSA excludes "$65 per month of earned income plus one-half of the remaining earned income in the month" from its calculations. POMS SI 00820.520. If the earned income, after the deduction, exceeds the benefits otherwise due, the applicant is not entitled to benefits. "[U]nearned income means all other income," including gifts furnished in cash or in kind, resources (including cash), and other support and maintenance. 42 U.S.C. § 1382a(a)(2); 20 C.F.R. §§ 416.1121, 416.1201. The SSA excludes "the first $20 per month of any unearned income other than in-kind support and maintenance." POMS SI 00810.420(1).

## III.   SSA Rules Regarding Overpayment and Waiver

An "overpayment" is the "difference between the amount paid to the beneficiary and the amount of payment to which the beneficiary was actually entitled." 20 C.F.R. § 404.504.

Section 204(a) of the Act requires the Commissioner to recover overpayment where an erroneous payment of benefits has been made. 42 U.S.C. § 404(a).

The Commissioner's recovery of the overpayment may be waived, however, if certain conditions are met:

> there shall be no adjustment of payments to, or recovery by the United States from, any person who is *without fault* if such adjustment or recovery would *defeat the purpose of this title* or would be *against equity and good conscience.*

42 U.S.C. § 404(b) (emphasis supplied). First, an individual "will not be without fault if the [SSA] has evidence in its possession which shows either *a lack of good faith* or *failure to exercise a high degree of care* in determining whether circumstances which may cause deductions from [her] benefits should be brought to the attention of the [SSA] by an immediate report or by return of a benefit check." 20 C.F.R. § 404.511(a) (emphasis supplied). "The high degree of care expected of an individual may vary with the complexity of the circumstances," such that "variances in the personal circumstances and situations of individual payees are to be considered in determining whether the necessary degree of care has been exercised." Id. Second, the regulations define "defeat the purpose" of Title II as "to deprive a person of income required for ordinary and necessary living expenses. This depends upon whether the person has an income or financial resources sufficient for more than ordinary and necessary needs, or is dependent upon all of his current benefits for such needs." 20 C.F.R. § 404.508(a). "Ordinary and necessary expenses" include fixed living expenses (food, clothing, rent, utilities, insurance, etc.), medical and similar expenses, expenses for dependents, and other miscellaneous expenses that are part of an individual's standard of living. 20 C.F.R. § 404.508(a)(1)-(4). Third, the regulations define "against equity and good conscience," in part, as when an individual relied upon a notice that a payment would be made, or because of the overpayment itself, "changed his or her position for

the worse [] or relinquished a valuable right." 20 C.F.R. § 404.509(a)(1). Only after the SSA

denies a waiver request may the claimant appeal the denial to an ALJ.

## IV.    Analysis

The Court considers only whether Bongarzone's income during the periods of September

2002 through December 2003, and June 2006 through January 2008 constitutes SGA, and if so,

the amount she was overpaid as a result.

There is no doubt that this is a "peculiar" case. Bongarzone received W-2 payments that

in every sense appear to be wages paid for employment, yet she claims that she did no work and

thus could not have been engaged in SGA. But however the money is characterized, Bongarzone

does not dispute that she received the reported income, and that it was available to her to pay for

her support and maintenance. Thus, contrary to Bongarzone's suggestions otherwise, even if the

ALJ found that Bongarzone had not engaged in SGA, the SSA would still be entitled to recovery

of overpayment: income, even if not received due to SGA, reduces the DIBs to which a claimant

is entitled. See 20 C.F.R. § 416.1102. The only difference in that scenario would be the method

of calculating the overpayment.[2]

In support of her motion for judgment on the pleadings, Bongarzone, through her

attorney, filed a memorandum of law that, remarkably, states no case law or legal arguments.

Instead, Bongarzone argues that (1) the funds do not establish that she was capable of performing

SGA and thus she was not overpaid, and (2) the ALJ erred by not issuing a subpoena, which

could have proved the nature of her compensation. In turn, in her motion in opposition and cross-

---

[2] Had the ALJ found that Bongarzone had not engaged in SGA, the SSA merely would have approached
this earned income with a different calculus: the SSA would deduct $65 per month of earned income plus
one-half of the month's remaining earned income, and if the resulting number were higher than the
benefits otherwise due – which, here, they are – the claimant would not be entitled to the benefits. POMS
SI 00820.520.

motion for judgment on the pleadings, the Commissioner argues that the ALJ's opinion is free of legal error and is supported by substantial evidence.

### A.    Substantial Evidence Supports the ALJ's Determination

#### 1.    Substantial Gainful Activity

Substantial evidence supports the ALJ's determination that Bongarzone engaged in SGA from September 2002 through December 2003, and June 2006 through January 2007.

To determine if a claimant has engaged in SGA, the ALJ must first determine whether the claimant's monthly earnings average more than the regulation's SGA earning level, in which case there is a rebuttable presumption that the claimant engaged in SGA. 20 C.F.R. §§ 404.1510, 404.1572, 404.1574. Because Bongarzone had been entitled to and received DIBs for at least 24 months before she began to receive earnings, the regulations specify that the ALJ did not need to consider any information other than her earnings to make the SGA determination. See 20 C.F.R. § 404.1574(b)(3)(iii). Here, as indicated by the ALJ, Bongarzone's earnings meet the presumption for all relevant time periods: in 2002, she received an average of $2,185.12 per month, which is more than the monthly $780.00 SGA level; in 2003, she received an average of $3,654.98 per month, which is more than the monthly $800.00 SGA level; and in 2006, she received $4,961.25 in the month of June, which is more than the monthly $860.00 SGA level. See POMS DI 10501.015. These amounts were paid to her as wages, from which taxes were withheld, and are accounted for on W-2 forms.

The burden then shifted to Bongarzone to rebut that presumption of having engaged in SGA, which Bongarzone failed to do. With regards to those time periods, Bongarzone testified that she did not have a job with Countrywide and First Lincoln but "a draw," and that her "job title was loan officer." (AR 358.) She alleged that she was put on a payroll and got paid even

though she did "not have to work . . . to go in [to the banks] . . . to do anything." (AR 368.) In return for lending a bank manager her name, the manager received a commission, and she received a draw. With regards to her payments from First Lincoln, however, she also testified that she was paid a finder's fee for making a loan referral. With respect to her work for Countrywide, her attorney characterized the efforts for which Bongarzone received earnings as follows: "[S]he went to the office of Country Wide once or twice a week. She might have handled two deals on the phone on the days that she worked." (AR 284.) The ALJ considered Bongarzone's testimony, but ultimately found that Bongarzone's account of having done "nothing" to receive earnings "so far fetched" that "[i]t stretches credulity." (AR 17.) The ALJ concluded that "whatever were her efforts," Bongarzone was paid for them, and the wages were paid in return for SGA. (Id.)

The Court does not reject out of hand the possibility that Bongarzone, potentially a cog in the fraudulent subprime mortgage scheme, did little to no work to receive substantial earnings. Work, however, "regardless of [its] legality," POMS DI 10501.001, "may be substantial even if . . . [claimants] do less, get paid less, or have less responsibility than when [they] worked before." 20 C.F.R. § 404.1572(a). That Bongarzone may have been paid based on a commission or referral fee also does not detract from the ALJ's finding, as any of these methods of payment are remuneration for services performed for a fee. 20 C.F.R. § 404.1041(b); POMS SI 820.100(B)(2)(c). Because substantial evidence supports the ALJ's findings, they are conclusive even though there may be some evidence to support Bongarzone's position as well. Diaz, 59 F.3d at 312; Brault, 683 F.3d at 448.

2.      **Amount of Overpayment**

Once the ALJ determined that Bongarzone had engaged in SGA, and thus was not entitled to the DIBs she had received, she had to determine the amount of Bongarzone's overpayment.

First, substantial evidence supports the ALJ's calculation that Bongarzone was overpaid in the amount of $19,239.00. Bongarzone had unreported earnings in 1999, 2002, 2003, 2005, and 2006. Because the SSA pays claimants during a nine-month Trial Work Period, Bongarzone was entitled to her DIBs from May through August 1999, and January through May 2002, the first nine months in which she reported earnings. Because the SSA pays claimants for the month the disability ends and the two subsequent months, Bongarzone was also entitled to her DIBs from June through August 2002. She was not, however, entitled to DIBs for September 2002 through December 2003, when she received earnings. During that time, her $2,185.12 monthly earnings (in 2002) and her $3,654.98 monthly earnings (in 2003) were above the relevant SGA levels, of $780.00 and $800.00 respectively. Thus, the ALJ correctly determined that Bongarzone had been overpaid in the amount of $12,574.00, minus $14.00 retained by the SSA, or $12,560.00.

| September 2002 through December 2003 | | | |
|---|---|---|---|
| **Months** | **Monthly Amount Credited** | **DIBs Due to Claimant** | **Overpayment** |
| 09/02 – 11/02 | $743.00 (x3) | $0.00 | $2,229.00 |
| 12/02 – 12/02 | $753.00 (x1) | $0.00 | $753.00 |
| 01/03 – 11/03 | $798.00 (x11) | $0.00 | $8,778.00 |
| 12/03 – 12/03 | $814.00 (x1) | $0.00 | $814.00 |
| | | **TOTAL:** | **$12,574.00** |
| | **TOTAL AFTER ADJUSTMENT** | | **$12,560.00** |

Because Bongarzone earned $4,961.15 in June 2006, her DIBs should have stopped that month into the future.[3] Pursuant to an Expedited Reinstatement process, however, the SSA found Bongarzone disabled as of February 2007. Therefore, Bongarzone had received DIBs she was not entitled to only for June 2006 through January 2007. During that period, her $4,691.25 earnings were above the monthly $860.00 SGA level and rendered her ineligible for DIBs. The ALJ correctly calculated Bongarzone's overpayment in the amount of $7,688.00. The SSA had withheld, and therefore owed Bongarzone, DIBs for February 2008, however, and that overpayment amount was reduced by the February 2008 DIBs, or $1,009.00, to reach $6,679.00:

| June 2006 through January 2008 | | | |
|---|---|---|---|
| **Months** | **Paid Monthly** | **DIBs Due to Claimant** | **Overpayment** |
| 06/06 – 11/06 | $953.00 (x6) | $0.00 | $5,718.00 |
| 12/06 – 12/06 | $984.00 (x1) | $0.00 | $984.00 |
| 01/07 – 11/07 | $986.00 (x11) | $0.00 | $10,846.00 |
| 12/07 – 01/08 | $1009.00 (x2) | $0.00 | $2,018.00 |
| **TOTAL June 2006 - January 2008:** | | | **$19,566.00** |
| **TOTAL after adjustment: June 2006 - January 2007:** | | | **$7,688.00** |
| **TOTAL June 2006 - January 2007 minus February 2008 DIBs due:** | | | **$6,679.00** |

Adding this overpayment amount of $6,679.00 to $12,560.00, Bongarzone's total overpayment is $19,239.00.

Second, substantial evidence supports the ALJ conclusion that Bongarzone was not without fault for her overpayment. See Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984) ("[T]he district court must uphold a decision by the Secretary that a claimant was not without fault if it is supported by substantial evidence in the record as a whole, because that determination is factual in nature." (citations omitted)). A claimant is not "without fault" where evidence "shows either a lack of good faith or failure to exercise a high degree of

---

[3] The SSA has not challenged Bongarzone's entitlement to DIBs between December 2003 and June 2006. Bongarzone's 2005 self-employment earnings in the amount of $1,295.04 also did not affect her benefits.

care" in failing to bring changed circumstances to the attention of the SSA. 20 C.F.R.

§ 404.511(a). The ALJ determined that Bongarzone's use of two SSNs – one of which she had

no reported earnings on but used to receive SSA DIBs, and the other of which she did have

earnings on – was deceptive. The sums Bongarzone received "were not so inconsequential and it

appears that she attempted to hide this income by using" two SSNs. (AR 21.) In conjunction with

the ALJ's finding that Bongarzone was not otherwise credible, the ALJ found that Bongarzone

knew or should have known of the discrepancy and could have avoided the overpayment at the

outset had she informed the SSA of her change in income.

Lastly, substantial evidence supports the finding of the ALJ and Appeals Council that

waiver was not properly before the ALJ. Because Bongarzone requested the waiver around

September 6, 2008, after her July 24, 2008 ALJ hearing, the SSA did not initially have a chance

to address the issue. (AR 157-64.) The Appeals Council found that the issue was not properly

before the ALJ, and in the ALJ's November 14, 2008 decision, she referred the waiver issue to

the relevant SSA office for consideration. Bongarzone's counsel never reinitiated or followed-up

on the waiver request, seeking a "file review" or a written decision on the matter, with the

appropriate SSA waiver reviewing body.[4] See 20 C.F.R. § 404.506(c).

### B.      The ALJ's Subpoena Denial Is Free of Legal Error

The ALJ's decision to deny Bongarzone's subpoena request does not constitute legal

error. "A claimant has a right to request issuance of a subpoena" at least five days before a

hearing date. HALLEX I-2-5-78 (SSA), 1992 WL 601841, at *1 (Sept. 28, 2005). See also 20

C.F.R. §§ 404.950(d)(2), 416.1450(d)(2). "The issuance of a subpoena may be necessary when a

---

[4] Because the regulations provide guidelines for when an "individual requests waiver more than 30 days
after receiving the notice of overpayment," Bongarzone is not necessarily foreclosed from seeking a
waiver – although the SSA will grant a waiver only where it finds the claimant is *without fault*. 20 C.F.R.
§§ 404.506(a), (b); POMS SI 02260.025.

person having knowledge of a material fact or possession of documentary evidence is reluctant or unwilling to . . . provide the evidence." HALLEX I-2-5-78, 1992 WL 601841, at *1. The ALJ must determine if the "issuance of a subpoena to secure the requested document(s) . . . *is reasonably necessary for the full presentation of the case* because the document(s) . . . can be *expected to prove important facts* that cannot be proved without a subpoena." Id. at *2 (emphasis supplied). "The ALJ need not rule on a prehearing or posthearing subpoena request until development has been completed and the case is ready to be scheduled for hearing or supplemental hearing." Id. When an ALJ denies a request, the ALJ must provide "written notification" that includes the ALJ's rationale and file the request and denial in the record. Id. The ALJ complied with these requirements.

In the ALJ's initial November 14, 2008 decision, she explained that she had declined to seek additional information from the relevant financial institutions about Bongarzone's earnings because Bongarzone admitted that she received the sums in question and "the facts elicited in this case" made additional information unnecessary. (AR 185.) After the Appeals Council's remand, the ALJ officially denied the request in writing, providing her rationale. In the May 19, 2010 letter, the ALJ stated that there was no confirmation that the individual that Bongarzone sought to subpoena was the same Margolies whom Bongarzone alleged was a bank manager. Although the ALJ provided no further explanation for the denial, the extent to which her rationale is brief is harmless error. Bongarzone argues "rather than giving [Bongarzone] every opportunity to secure the necessary documentation to support her claim regarding the nature of her compensation (an essential issue considering [her] lack of significant involvement with the bank's [sic] at issue), the Defendant refused to issue a subpoena o[n] what is a technically significant ground, namely that the requested subpoena may not have identified the correct bank

officer." (ECF No. 28 at 5.) It is unclear to the Court whether Bongarzone in fact meant "technically *in*significant ground," but regardless, the standards that Bongarzone invokes are not applicable to a subpoena request: a counseled plaintiff is not entitled to "every opportunity to secure the necessary documentation" when an ALJ determines that a subpoena seeks documentation that is not reasonably necessary for the case's full presentation. The ALJ included Bongarzone's subpoena request, and the ALJ's denial of it, in the record, and substantial evidence supports her conclusion.

## CONCLUSION

For the foregoing reasons, the ALJ's determination is supported by substantial evidence and is free of legal error. Bongarzone was overpaid by $19,239.00. The Commissioner's motion for judgment on the pleadings is GRANTED, and Bongarzone's motion is DENIED.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:      New York, New York
             April 29, 2015